UNITED STATES DISTRICT COURT
SOUTHERN DISTIRCT OF NEW YORK

------------------------------------------------------------------- X

XAVIER ROPER and WILLIAM LOGAN LOCKETT,

                                            Plaintiffs,

                        -against-

THE CITY OF NEW YORK, a municipal entity, POLICE OFFICER JEREMIAH WINTER, POLICE OFFICER MICHAEL SHULTIS, INSPECTOR TIMOTHY BEAUDETTE, DEPUTY INSPECTOR JOHN HART, POLICE OFFICER "LOMBARDO," NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs,'" and POLICE OFFICERS "JOHN DOES 1-10" (names and number of whom are unknown at present), and other unidentified members of the New York City Police Department,

                                          Defendants.

------------------------------------------------------------------- X

INDEX NO.: 15-CV-8899 (AT)

ECF CASE

FIRST
AMENDED COMPLAINT
[JURY TRIAL DEMANDED]

      Plaintiffs XAVIER ROPER and WILLIAM LOGAN LOCKETT, by their

attorneys, ELLIOT DOLBY-SHIELDS, Esq. and SAMUEL B. COHEN, Esq.,

complaining of the defendants, respectfully allege as follows:

## I.      <u>PRELIMINARY STATEMENT</u>

> [T]he . . . streets and parks . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all;. . . but it must not, in the guise of regulation, be abridged or denied.
>
> *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

1.   Plaintiffs XAVIER ROPER and WILLIAM LOGAN LOCKETT bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of his civil rights, as said rights are secured by said statutes, the Constitutions of the State of New York and the United States, and the common law and the laws of the State of New York.

2.   On December 4, 2014, Plaintiff XAVIER ROPER was walking home after classes at John Jay College of Criminal Justice, and stopped in the vicinity of Times Square to observe and document the New York Police Department ("NYPD")'s response to a peaceful demonstration by activists associated with the Black Lives Matter movement ("Black Lives Matter," "BLM").

3.   At or around the same time, Plaintiff WILLIAM LOGAN LOCKETT, a freelance photographer, was also present in the same vicinity to photograph the same Black Lives Matter protest.

4.   Defendant INSPECTOR TIMOTHY BEAUDETTE issued an order for demonstrators in the same area as Plaintiff XAVIER ROPER to disperse. However, NYPD officers did not provide a path for dispersal, preventing Plaintiff XAVIER ROPER from complying with NYPD orders.

5.   Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'" then ordered police officers in the vicinity of Plaintiff XAVIER ROPER to "just take somebody and put them in cuffs."

6.   A Defendant "John Doe" Police Officer then suddenly grabbed Plaintiff XAVIER ROPER and dragged him to a location where several additional "John

Doe" NYPD Officers were standing. Shortly after the Defendant John Doe police officers falsely arrested Plaintiff XAVIER ROPER, John Doe NYPD Officer # 1 turned over Plaintiff XAVIER ROPER to Defendant POLICE OFFICER JEREMIAH WINTER ("Defendant OFFICER WINTER"). Defendant OFFICER WINTER and several Defendant John Doe police officers then fastened a set of flex-cuffs on Plaintiff XAVIER ROPER's wrists.

7. Defendant DEPUTY INSPECTOR JOHN HART then swore out a criminal complaint against Plaintiff XAVIER ROPER that falsely alleged two charges of Disorderly Conduct, for allegedly blocking traffic in an area closed off from traffic by police, and for allegedly refusing an order to disperse when no path for dispersal was available.

8. Plaintiff WILLIAM LOGAN LOCKETT was also contained by police in the vicinity of Times Square at or around the same time. As he was attempting to leave the area to find a restroom, he was seized by Defendant Police Officers including but not limited to Defendant POLICE OFFICER "LOMBARDO," whose full name is not known to Plaintiffs at this time, and placed under arrest for a single count of disorderly conduct, for allegedly failing to comply with an order to disperse when he was, in fact, attempting to leave the area in question.

9. The charges against both Plaintiffs have since been dismissed and sealed.

10. The police action that resulted in Plaintiffs XAVIER ROPER and WILLIAM LOGAN LOCKETT's arrests was under the overall charge of Defendant

DEPUTY INSPECTOR JOHN HART and Defendant INSPECTOR TIMOTHY BEAUDETTE.

11. Defendants' actions created a substantial chilling effect and deterrent to First Amendment protected activity by burdening free speech activities with the risk of arrest, of being threatened with physical harm and of being, in fact, injured by the police, bound with handcuffs and having one's identification and association with a demonstration be collected and recorded by the police and transferred to federal and other law enforcement authorities for data warehousing and collection. These are civil rights violations that the Constitution does not permit.

12. Now, Plaintiffs XAVIER ROPER and WILLIAM LOGAN LOCKETT bring this suit in a quest for answers as to why—despite the fact that each Plaintiffs were at all times compliant with the law and individual Defendants' orders to the best of their capacities—New York Police Officers sworn to serve and protect Plaintiffs instead harassed and arrested them, seemingly due entirely to Plaintiffs' proximity to a Black Lives Matter event and their documenting of said event and the NYPD's reaction to the event.

## II. <u>JURISDICTION</u>

13. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

14. Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes of action

which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

### III.   VENUE

15. Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b) and (c) and § 1402(b) because the claims arose in this district.

### IV.   JURY DEMAND

16.  Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V.   THE PARTIES

17. Plaintiff XAVIER ROPER is a citizen of the United States and a resident of the County of Essex, Township of Bloomfield, State of New Jersey.

18. Plaintiff WILLIAM LOGAN LOCKETT is a citizen of the United States and a resident of the County of Travis, City of Austin, State of Texas.

19. Defendant CITY OF NEW YORK was and is a municipal entity created and authorized under the laws of the State of New York.

20. Defendant CITY OF NEW YORK maintains the New York Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

21. At all times, Defendant POLICE OFFICER JEREMIAH WINTER was a duly sworn police officer of the NYPD and was acting under the supervision of the

NYPD and according to his official duties. Plaintiff asserts his claim against Defendant POLICE OFFICER JEREMIAH WINTER in both his official and individual capacities.

22. At all times, Defendant POLICE OFFICER MICHAEL SHULTIS was a duly sworn police officer of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Plaintiff asserts his claim against Defendant POLICE OFFICER MICHAEL SHULTIS in both his official and individual capacities.

23. At all times, Defendant POLICE OFFICER "LOMBARDO" was a duly sworn police officer of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Plaintiff asserts his claim against Defendant POLICE OFFICER "LOMBARDO" in both his official and individual capacities.

24. Defendant POLICE OFFICER "LOMBARDO" participated in the physical arrest of Plaintiff WILLIAM LOGAN LOCKETT, but was not noted on paperwork available to Plaintiff relative to same.  On information and belief, the complete identity of Defendant POLICE OFFICER "LOMBARDO" is in possession of Defendants and will be evinced through discovery herein.

25. At all times, Defendant INSPECTOR TIMOTHY BEAUDETTE, was a duly sworn police officer of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Plaintiff asserts his claim against Defendant INSPECTOR TIMOTHY BEAUDETTE in both his official and individual capacities.

26. Defendant DEPUTY INSPECTOR TIMOTHY BEAUDETTE is the Commanding Officer of the NYPD's Patrol Borough Manhattan South and, upon information and belief, was the Commanding Officer of the NYPD's Patrol Borough Manhattan South at the time of the events alleged herein. Prior to being appointed to the

6

NYPD's Patrol Borough Manhattan South, Defendant DEPUTY INSPECTOR BEAUDETTE was the commanding officer of the NYPD's Midtown North Precinct for approximately three years. In his roles as Commanding Officer of the NYPD's Midtown North Precinct and Patrol Borough Manhattan South, Defendant BEAUDETTE made and enforced the policies of the NYPD's Midtown North Precinct and the Patrol Borough Manhattan South, and acted in his capacity as agent, servant, and employee of Defendant City, within the scope of his employment as such, and under the color of state law.

27. At all times, Defendant DEPUTY INSPECTOR JOHN HART, was a duly sworn police officer of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Plaintiff asserts his claim against Defendant DEPUTY INSPECTOR JOHN HART in both his official and individual capacities.

28. Defendant DEPUTY INSPECTOR JOHN HART is the Commanding Officer of the NYPD's Manhattan North Precinct and, upon information and belief, was the Commanding Officer of the NYPD's Manhattan North Precinct at the time of the events alleged herein. In his role as Commanding Officer, Defendant Hart made and enforced the policies of the Manhattan North Precinct, and acted in his capacity as agent, servant, and employee of Defendant City, within the scope of his employment as such, and under the color of state law.

29. At all times, Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'" was a duly sworn police officer of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Plaintiff asserts his claim against Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put

Them In Cuffs'" in both his official and individual capacities. This "white shirt" officer was recorded on video instructing other lower-ranking defendant NYPD officers to "Just take somebody and put them in cuffs." A photograph of this individual officer is attached hereto as Exhibit A.

30. All NYPD supervisory defendants, including but not limited to Defendant DEPUTY INSPECTOR TIMOTHY BEAUDETTE, Defendant DEPUTY INSPECTOR JOHN HART, and Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'" are referred to collectively herein as the "Supervisory Defendants."

31. Defendants "John Does 1–10" were those officers who were part of the group of members of service of the NYPD that assisted in the detainment and arrest of Plaintiffs.

32. That at all times hereinafter mentioned, Defendant POLICE OFFICER JEREMIAH WINTER, Defendant POLICE OFFICER MICHAEL SHULTIS, Defendant INSPECTOR TIMOTHY BEAUDETTE, Defendant DEPUTY INSPECTOR JOHN HART, NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'", Defendant POLICE OFFICER "LOMBARDO" and Defendant POLICE OFFICERS "JOHN DOES 1-10" (Collectively, "Defendant POLICE OFFICERS," individually, "Defendant POLICE OFFICER"), were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

33. At all times relevant herein, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state law and/or in

8

compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

34. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the course and scope of their duties and functions as agents, servants, employees and officers of the Defendant CITY OF NEW YORK.

35. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by Defendant CITY OF NEW YORK.

36. Plaintiffs, in furtherance of their causes of action brought pursuant to New York State law, each filed timely Notices of Claim against the CITY OF NEW YORK, in compliance with the Municipal Law Section 50.

37. More than thirty (30) days have elapsed since service of said Notices of Claim was filed and THE CITY OF NEW YORK has failed to pay or adjust the claims.

VI.     **STATEMENT OF FACTS**

a. **XAVIER ROPER**

38. Plaintiff XAVIER ROPER is an undergraduate student at the John Jay College of Criminal Justice, majoring in forensic psychology.

39. Plaintiff XAVIER ROPER chose to attend John Jay due to his interest in criminal justice.

9

40. On the evening of December 4, 2014, Plaintiff Xavier Roper finished classes at John Jay for the evening, and decided to go to Times Square to observe and document police interactions at a Black Lives Matter protest occurring there.

41. On the evening of December 4, 2014, at or around 8:00 PM, Plaintiff XAVIER ROPER was present near the intersection of 42nd Street and Broadway in Times Square, New York, New York.

42. At all times relevant to the events described herein, Plaintiff XAVIER ROPER was acting as a citizen photojournalist.

43. Plaintiff XAVIER ROPER had been observing and documenting the NYPD's preparation for the demonstration and the demonstration itself for approximately one hour before the events giving rise to the incident in question began.

44. Defendant INSPECTOR HART is the commanding officer of the NYPD's Midtown North precinct.[1] Defendant INSPECTOR HART was appointed commanding officer of the NYPD's Midtown North precinct in April 2014.[2] Defendant INSPECTOR HART replaced Defendant DEPUTY INSPECTOR BEAUDETTE as the commanding officer of the NYPD's Midtown North Precinct, when Defendant DEPUTY INSPECTOR BEAUDETTE was appointed to the Patrol Borough Manhattan South.[3] Prior to being appointed to the NYPD's Patrol Borough Manhattan South, Defendant

---

[1] Katz, Matthew, *New Commanding Officer Takes Over Midtown North Precinct,* DNAinfo (Apr. 7, 2014, 4:25 PM), https://www.dnainfo.com/new-york/20140407/midtown/new-commanding-officer-takes-over-midtown-north-precinct. Incorporated by reference herein.
[2] *Id.*
[3] *Id.*

DEPUTY INSPECTOR BEAUDETTE was the commanding officer of the NYPD's Midtown North Precinct for approximately three years.[4]

45. The midtown north precinct includes Times Square, where the December 4, 2014 Black Lives Matter demonstration occurred.

46. As the commanding officers for the NYPD's Midtown North precinct and Patrol Borough Manhattan South, Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE developed, implemented, enforced, perpetuated and/or allowed the policies of the NYPD regarding non-violent and lawful expressions of speech in and around Times Square.

47. Upon information and belief, Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE were in overall charge of policing the protest activities that occurred in and around the Times Square on December 4, 2014.

48. Prior to the arrival of the protesters, Plaintiff XAVIER ROPER observed the NYPD, including officers under the command of Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE, erect metal barricades on or around the perimeter of the pedestrian island in the center of Times Square.

49. Plaintiff XAVIER ROPER observed the group of Black Lives Matter protesters march into Times Square.

50. Plaintiff XAVIER ROPER observed the NYPD, including officers under the command of Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE, react to the protesters arrival at Times Square by standing

---

[4] *Id.*

shoulder-to-shoulder, forming a wall of officers, preventing the protesters from proceeding any further.

51. The actions of the police and the Defendant POLICE OFFICERS, including officers under the command of Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE, closed off the streets to vehicular traffic at this time.

52. After the protesters arrived in Times Square, Plaintiff XAVIER ROPER observed at least one instance of police officers pushing, grabbing, and arresting a Black Lives Matter protester in an unreasonably aggressive manner without apparent cause or justification.

53. At or around that time, Plaintiff XAVIER ROPER moved towards the incident in progress, while remaining a safe distance away, to photograph and video record the police action from a different perspective.

54. Plaintiff XAVIER ROPER moved into the street, which was closed off by police and not in use for vehicular traffic.

55. After Plaintiff XAVIER ROPER moved into the closed street to photograph and video record the protest, Defendant DEPUTY INSPECTOR BEAUDETTE issued an order for the protesters to leave the street and move to the sidewalk.

56. Plaintiff XAVIER ROPER attempted to move from the street to the sidewalk, but he was prevented from moving onto the sidewalk by the metal barricades and wall of NYPD officers.

57. In this area of Times Square, the NYPD, including officers under the command of Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE, executed indiscriminate trap-and-arrest tactics to unlawfully trap and arrest protesters, including persons such as Plaintiff XAVIER ROPER who had merely been present in the area to observe and document the protest activities.

58. Plaintiff XAVIER ROPER was unable to comply with the police order to disperse due to the actions of the Defendant POLICE OFFICERS in blocking off all avenues of potential dispersal.

59. When Defendant OFFICER BEAUDETTE issued the order for the protesters to leave the street and move to the sidewalk, he knew or should have known that the protesters and individuals present in Times Square merely observing and/or documenting the protest activities such as Plaintiff XAVIER ROPER, would be unable to comply with his order to disperse due to the actions of the Defendant POLICE OFFICERS in blocking off all avenues of potential dispersal.

60. Shortly thereafter, Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'" instructed Defendant POLICE OFFICERS in the vicinity of Plaintiff XAVIER ROPER to "Just take somebody and put them in cuffs."

61. Immediately thereafter, a Defendant POLICE OFFICER grabbed Plaintiff XAVIER ROPER and informed him that he was under arrest.

62. Plaintiff XAVIER ROPER asked the Defendant POLICE OFFICER why he was under arrest, and the Defendant POLICE OFFICER responded, "because you were standing in the street."

63. Upon information and belief, at or around this time, the Defendant "JOHN DOE" POLICE OFFICER informed Defendant DEPUTY INSPECTOR HART that, "okay Johnny, I've got another one at eight arrested."

64. Upon information and belief, at or around this time, Defendant DEPUTY INSPECTOR HART approved the unlawful arrest of Plaintiff XAVIER ROPER by the Defendant "JOHN DOE" POLICE OFFICER, despite the fact that Defendant INSPECTOR HART knew that there was no particularized probable cause to arrest Plaintiff XAVIER ROPER for Disorderly Conduct in violation of PL 240.20(5) or PL 240.20(6), or for any other crime.

65. Upon information and belief, after Plaintiff XAVIER ROPER was arrested, Plaintiff XAVIER ROPER requested that Defendant "JOHN DOE" POLICE OFFICER identify himself.

66. Upon information and belief, the Defendant "JOHN DOE" POLICE OFFICER refused to identify himself to Plaintiff XAVIER ROPER.

67. Under NYPD Patrol Guide Section 203-09, "Public Contact – General," an officer must "[c]ourteously and clearly state [his or her] rank, name, shield number and command, or otherwise provide them, to anyone who request [he or she] to do so."

68. Under NYPD Patrol Guide Section P.G. 206-03, "Violations Subject to Command Discipline," it is a Schedule B violation for an officer to fail to "give name and shield number to person requesting."

69. Upon information and belief, at or around this time, the Defendant "JOHN DOE" POLICE OFFICER falsely informed Defendant OFFICER WINTER that Plaintiff XAVIER ROPER was arrested for standing in the street.

70. Upon information and belief, Defendant WINTER knew that Plaintiff XAVIER ROPER was in fact not arrested for standing in the street.

71. Upon information and belief, Defendant WINTER knew that Plaintiff XAVIER ROPER was arrested in retaliation against the Black Lives Matter demonstrators, in an attempt to chill and intimidate the Black Lives Matter demonstrators and to deter them from continuing demonstrations.

72. At no time did Plaintiff XAVIER ROPER block either vehicular or pedestrian traffic.

73. At no time did Plaintiff XAVIER ROPER block vehicular or pedestrian traffic of his own volition—instead, any blocking of vehicular or pedestrian traffic occurred solely as a result of the Defendant POLICE OFFICERS erecting metal barricades and a human wall that confined the protesters to an area located in the street and prevented them from moving out of the street onto the sidewalk.

74. Plaintiff XAVIER ROPER had not refused to comply with a lawful order of the police to disperse.

75. At no time did Plaintiff XAVIER ROPER fail to disperse and leave the area of his own volition—instead, any failure to disperse and leave the area occurred solely as a result of the Defendant POLICE OFFICERS erecting metal barricades and a human wall that confined the protesters to an area located in the street and prevented them from moving out of the street onto the sidewalk.

76. Thereafter, Defendant OFFICER WINTER and two Defendant "JOHN DOE" POLICE OFFICERS fastened a set of plastic flexcuff handcuffs tightly around Plaintiff XAVIER ROPER's wrists.

77. Defendant OFFICER WINTER and the two Defendant "JOHN DOE" POLICE OFFICERS fastened a set of plastic flexcuff handcuffs tightly around Plaintiff XAVIER ROPER's wrists because Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'" instructed Defendant POLICE OFFICERS in the vicinity of Plaintiff XAVIER ROPER to "Just take somebody and put them in cuffs."

78. After he was placed in handcuffs, Plaintiff XAVIER ROPER was forced to stand outside in the cold for over an hour.

79. Defendant NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'", Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE caused and/or participated and/or approved and/or ordered the arrests that included those near the intersection of 42nd Street and Broadway in Times Square; i.e., those involving Plaintiff XAVIER ROPER.

80. After approximately an hour and a half, one or more Defendant POLICE OFFICERS placed Plaintiff XAVIER ROPER in a nearby police vehicle.

81. The Defendant POLICE OFFICERS then transported Plaintiff to, upon information and belief, One Police Plaza.

82. There the Defendant POLICE OFFICERS would detain Plaintiff XAVIER ROPER for approximately 11 hours, until he was released at approximately 9:00 AM.

83. The Defendants issued Plaintiff XAVIER ROPER a Desk Appearance Ticket for a return date of February 17, 2015.

84. Thereafter, on or about February 2, 2015, Defendant OFFICER HART swore out a criminal information falsely charging Plaintiff XAVIER ROPER with two counts of Disorderly conduct—PL 240.20(5) and PL 240.20(6).

85. Defendant OFFICER HART swore to the facts in the criminal information approximately six weeks after the arrest of Plaintiff XAVIER ROPER, and, upon information and belief, did not have personal knowledge of any of the facts alleged in the criminal information.

86. Plaintiff XAVIER ROPER appeared before the Court on approximately five (5) occasions following the Defendant POLICE OFFICER'S December 4, 2014 arrest.

87. Plaintiff XAVIER ROPER received an Adjournment in Contemplation of Dismissal in resolution of the violation charges against him.

88. The violation charges against Plaintiff XAVIER ROPER have since been dismissed and sealed.

89. As a result of the foregoing, Plaintiff XAVIER ROPER sustained, *inter alia*, mental injuries, emotional distress, embarrassment, humiliation, and deprivation of his constitutional rights.

b. **WILLIAM LOGAN LOCKETT**

90. Plaintiff WILLIAM LOGAN LOCKETT is a freelance photojournalist who regularly markets and sells his photographs as a means of supporting himself.

91. Plaintiff WILLIAM LOGAN LOCKETT is not a New York Resident and has never applied for an NYPD press credential.

92. On the evening of December 4, 2014, Plaintiff WILLIAM LOGAN LOCKETT was present in the vicinity of Times Square to document the Black Lives Matter demonstration occurring there and the NYPD's response to same.

93. Throughout the evening in question, Plaintiff WILLIAM LOGAN LOCKETT complied with all relevant police orders, and took photographs of the protest and protester interactions with police.

94. Throughout the evening in question, Plaintiff WILLIAM LOGAN LOCKETT took pains to separate himself from demonstrators, seeking to remain objective in his work and to send the clear message to police that he was not a part of the protests.

95. After a time, Plaintiff WILLIAM LOGAN LOCKETT found himself in need of a restroom, and decided to leave the area of the protest to find same.

96. Plaintiff WILLIAM LOGAN LOCKETT, who was plainly not a New York City local, observed a subway stop across the street from his location, and decided to see if a restroom was available there for his use.

97. At that time, Defendant Police Officers had closed both crosswalks on the block in question, and were not allowing pedestrians to use same.

18

98. At that time, Defendant Police Officers had completely closed the road of the block in question to vehicular traffic.

99. In light of these developments, Plaintiff WILLIAM LOGAN LOCKETT knew that he would not be obstructing traffic by crossing the road in question, as it was closed to vehicular traffic at that time by Defendant Police Officers.

100. Plaintiff WILLIAM LOGAN LOCKETT crossed the road, and was apprehended as he attempted to leave the protest area by Defendant Police Officers including but not limited to Defendant POLICE OFFICER "LOMBARDO."

101. Despite the facts that WILLIAM LOGAN LOCKETT had heard no order to disperse and was attempting to leave the area at the time of his arrest, Defendant Police Officers including POLICE OFFICER "LOMBARDO" arrested Plaintiff WILLIAM LOGAN LOCKETT for disorderly conduct under P.L. 240.20(6), for allegedly willfully or recklessly refusing to comply with a lawful order to disperse.

102. Defendant Police Officers including Defendant POLICE OFFICER "LOMBARDO" roughly placed Plaintiff WILLIAM LOGAN LOCKETT in flexi-cuffs, aggravating a pre-existing shoulder injury and causing Plaintiff WILLIAM LOGAN LOCKETT to suffer pain, discomfort and injury.

103. Defendant Police Officers including Defendant POLICE OFFICER "LOMBARDO," at the behest of a Defendant Supervising Officer, tendered Plaintiff WILLIAM LOGAN LOCKETT to Defendant POLICE OFFICER MICHAEL SHULTIS to have said Defendant serve as said Plaintiff's arresting officer, even though Plaintiff WILLIAM LOGAN LOCKETT had not previously observed Defendant POLICE OFFICER MICHAEL SHULTIS in his vicinity or observing or participating in his arrest.

104.   On information and belief, Defendant POLICE OFFICER MICHAEL SHULTIS was improperly assigned Plaintiff WILLIAM LOGAN LOCKETT's arrest for processing under policies promulgated or condoned by the Defendant Supervising Officers.

105.   Defendant POLICE OFFICER MICHAEL SHULTIS falsely averred to firsthand observations of conduct not engaged in by Plaintiff WILLIAM LOGAN LOCKETT in the criminal complaint against said Plaintiff.

106.   Plaintiff WILLIAM LOGAN LOCKETT was held in police custody for a period of hours thereafter, in significant discomfort, as he was not allowed to use restroom facilities until several hours after his arrest.

107.   The following morning, Plaintiff WILLIAM LOGAN LOCKETT was released with a desk appearance ticket for disorderly conduct.

108.   At his first appearance before the Court, Plaintiff WILLIAM LOGAN LOCKETT was offered and accepted an Adjournment in Contemplation of Dismissal of the violation charge against him, and said charge has since been dismissed and sealed.

c.   **FACTS RELATING TO BOTH PLAINTIFFS**

109.   Upon information and belief, Plaintiffs were arrested in retaliation for recording, documenting and observing the Black Lives Matter demonstrations and the NYPD's response to the Black Lives Matter demonstrations.

110.   Upon information and belief, the Defendant POLICE OFFICERS arrested Plaintiffs in retaliation against the Black Lives Matter demonstrators, in an

attempt to chill and intimidate the Black Lives Matter demonstrators and to deter them from continuing demonstrations.

111.   Upon information and belief, the Defendant POLICE OFFICERS arrested Plaintiffs in retaliation against journalists covering Black Lives Matter demonstrators, in an attempt to chill and intimidate media agents from documenting Black Lives Matter demonstrations and to thus deter the protesters from continuing demonstrations by marginalizing same and enhancing the risk of protesters suffering physical harm at the hands of police without credible reporting of same.

### THE PLAINTIFFS WERE FALSELY ARRESTED PURSUANT TO THE UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS OF THE DEFENDANT CITY OF NEW YORK AND THE NYPD

112.   In recent years, the NYPD has followed an apparent custom, policy or practice of executing indiscriminate "trap-and-arrest" tactics, in which they allow public protest activities to proceed for a time, then arbitrarily surround and enclose individuals engaged in public protest activities with large numbers of NYPD officers and issue orders to disperse without providing avenues for individuals to comply with said orders. The NYPD's trap-and-arrest tactics cause NYPD officers to trap and arrest protesters, including or predominately persons who had merely been present in the area, or were merely observing and/or documenting the protest activities, in mass civil rights violations. This apparent custom, policy or practice has resulted in dozens of unfounded

criminal prosecutions and at least tens of million of dollars in civil judgments against the City of New York.[5]

113.    This apparent custom, policy or practice was a cause of the Plaintiffs' arrests.

114.    Over the past decade, and continuing to the present, the NYPD has pursued an un-official policy of directing, instructing, compelling and mandating its employees to perform a mandatory number of arrests, issue a mandatory number of summonses and/or write a mandatory number of tickets in order to meet qualitative "productivity goals" (i.e. arrest quotas)[6], over a defined period of time, as a performance standard—despite several lawsuits brought by NYPD officers accusing the City and the NYPD of retaliating against officers for reporting and/or complaining about the NYPD's

---

[5] *See, e.g., Dinler et al. v. City of New York et al.*, SDNY 04cv7922 (RJS) (Summary Judgment granted against Defendants for mass false arrest of 2004 RNC protesters who were ordered to disperse and not given opportunity to disperse.); *Peat et al. v. City of New York*, SDNY 12cv8320 (SAS) (14 individuals stopped and enclosed arbitrarily by police during peaceful march ordered to disperse, no avenue of dispersal provided, arrested for disorderly conduct, all charges declined for prosecution.  Case resolved in Rule 68 offers of judgment to all Plaintiffs and payment of $333k in attorneys' fees by Defendant City of New York); *Dierken et al v. City of New York et al.*, SDNY 12cv7462(RWS) (7 individuals stopped and enclosed arbitrarily by police during peaceful march allegedly ordered to disperse, no avenue of dispersal provided, arrested for disorderly conduct, all charges dismissed.  Case resolved by Rule 68 offers of judgment to all mass arrest Plaintiffs and payment of $100k+ in attorneys' fees by Defendant City of New York.); Daniel Beekman and Erin Durkin, *City pays $18 million to settle lawsuits stemming from 2004 Republican National Convention at Madison Square Garden,* NEW YORK DAILY NEWS (Jan. 15, 2014), http://www.newsweek.com/understanding-data-lawsuits-new-york-police-department-392729. The article is incorporated herein by reference.

[6] Knafo, Saki, *A Black Police Officer's Fight Against the N.Y.P.D.,* N.Y. Times (Feb. 18, 2015), http://www.nytimes.com/2016/02/21/magazine/a-black-police-officers-fight-against-the-nypd.html?_r=0. The article is incorporated herein by reference. Yaniv, Oren, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. DAILY NEWS (Feb. 19, 2011).

illegal quota system.[7] Officers that fail to meet their quotas are punished, while employees who meet the quotas are rewarded. During the same time period, the NYPD has stated officially that it does not maintain a system of productivity goals. This apparent custom, policy or practice has resulted in numerous unfounded criminal prosecutions and significant liability for the City of New York.[8]

115.    This apparent custom, policy or practice was a cause of the Plaintiffs' arrests.

116.    In recent years, the NYPD has followed an apparent custom, policy or practice of targeting both professional and citizen journalists for arrest at times when said journalists are recording or otherwise documenting police interactions with civilians, in protest and other situations. This apparent custom, policy or practice has resulted in numerous unfounded criminal prosecutions and significant liability for the City of New York.[9]

---

[7] *See, e.g.*, Matthews v. City of New York, 12-cv-1354 (S.D.N.Y. 2012) (City of New York agreed to settlement of the lawsuit on the following terms: i) to void plaintiff's 2011 evaluation's 2.5 rating and to confirm in writing that plaintiff is no longer subject to Level 1 Command Monitoring as a result of his 2011 negative rating now deemed void; ii) to pay plaintiff back wages in the total amount of $32,582.78, less lawful deductions, including but not limited to taxes; iii) to pay plaintiff compensatory damages in the amount of $125,000; and iv) to pay the New York Civil Liberties Union Foundation attorney fees in the amount of $130,000.); Raymond et al. v. City of New York, et al., 15-CV-06885 (S.D.N.Y. 2015).

[8] *Id.*

[9] *See, e.g.*, Winnie Hu, *New York Police Officer Is Convicted of Lying About Photographer's Arrest*, N.Y. TIMES (Oct. 15, 2015), http://www.nytimes.com/2015/10/16/nyregion/new-york-police-officer-is-convicted-of-lying-about-photographers-arrest.html?_r=0 (describing felony conviction of NYPD Officer who swore to false and unfounded charges against press photographer Robert Stolarik to justify arrest and use of force against same); Anna Merlan, *City Will Pay $55,000 To Settle Case Of Occupy Livestreamer Josh Boss, Tackled By High-Ranking Nypd Chief*, VILLAGE VOICE, (Apr. 24, 2014), *available at* http://www.villagevoice.com/news/city-will-pay-55-000-to-settle-case-of-occupy-

117.    This apparent custom, policy or practice was a cause of the Plaintiffs' arrests.

118.    In recent years, the NYPD has followed an apparent custom, policy or practice of targeting, brutalizing and falsely arresting peaceful protesters, particularly those, such as Black Lives Matter protesters, who are critical of the NYPD.

119.    This apparent custom, policy or practice was a cause of the Plaintiffs' arrests.

120.    The NYPD's custom, policy, or practice of unlawfully targeting, brutalizing and falsely arresting peaceful protesters appears to flow from a patently unconstitutional premise: that engaging in peaceful assembly and petitioning government for redress of grievances through public demonstration is an invitation for harassment by law enforcement.

121.    Black Lives Matter is a movement of individuals and ideas that seek, *inter alia*, to call attention to and change inequalities and ill effects created through systems of structural racism in American society, including, but not limited to, police brutality against African Americans, which prevent a vast majority of individuals from enjoying the rights, liberties, and freedoms guaranteed to them by the United States Constitution.

---

livestreamer-josh-boss-tackled-by-high-ranking-nypd-chief-6675429      (coverage   and multiple videos of NYPD Chief Thomas Purtell physically tackling and seizing videographer at peaceful march, subordinate officer cheering "Kick His Ass, Tom!" as Purtell strikes Boss without apparent justification); *see, e.g.*, Nikko Koppel, *When Photographs Become Evidence*, N.Y. TIMES,  (Nov. 5, 2015) ("Indeed, on Thee Rant, a message board described as 'New York City cops speaking their minds,' one commenter, dominop, responded to a post about Officer Ackermann's conviction: 'Lock up everyone in or connected with the press that you can, every chance you get! Know your enemy!'"). Articles cited above incorporated by reference herein.

122.    The Black Lives Matter movement was formed in the wake of the July 2013 acquittal of George Zimmerman in the shooting death of Trayvon Martin, and gained widespread national support following the deaths of Michael Brown and Eric Garner, both unarmed African Americans killed by police officers July and August 2014.

123.    Black Lives Matter demonstrations have been the subject of intense police scrutiny and surveillance in New York. While the MTA has released copious records of their surveillance of Black Lives Matter demonstrations in response to FOIL requests, the NYPD has declined to respond to substantially identical FOIL requests.

124.    On information and belief, founded on review of materials and intraagency communications released by the MTA in compliance with FOIL, the NYPD and Defendant CITY OF NEW YORK maintain surveillance of lawful Black Lives Matter protests and protest figures in violation of the *Handschu* consent decree.

125.    On information and belief, founded on review of materials and intraagency communications released by the MTA in compliance with FOIL, the NYPD and Defendant CITY OF NEW YORK maintain surveillance of lawful Black Lives Matter protests and protest figures in violation of the *Handschu Guidelines*, as outlined in the NYPD Patrol Guide Section 217-72 and Appendix A thereto.[10]

---

[10] The *Handschu Guidelines*, as amended, limit the investigation of political activity to those circumstances not based solely on activities protected by the First Amendment, but which include either specific information of criminal activity, or call for criminal acts of violence. Specifically, after the September 11, 2001 terrorist attacks, the *Handschu Guidelines* were modified to give the NYPD greater leeway to investigate terrorism; however, *Handschu Guidelines* still prohibit the NYPD from investigating political activities in the absence of credible evidence that those activities call for criminal acts,

126.    In recent years, the NYPD has followed an apparent custom, policy or practice of arresting individuals, including Plaintiffs, engaged in expressive speech activity in the absence of actual criminal conduct, in violation of each individual's right to protest under the First Amendment and the Fourth Amendment's prohibition against unlawful searches and seizures.

127.    Despite the fact that the City of New York is constantly alive with citizens exercising their right to protest, the City of New York has continually failed to appropriately police the many non-violent and lawful expressions of speech, resulting in the continual breach of individual rights, the waste of judicial and civic resources, and the need for appropriate training policies, methodologies, and systems to address individuals conducting peaceful and legal expressive speech as protected under the First Amendment.

128.    The NYPD's officer training for protest activities provides inadequate constitutional guidance, and the NYPD's officer training fails to address or explain the First Amendment rights of participants in peaceful protest activities. Instead, the NYPD's officer training for protest activities focuses on training officers in various marching formations.

129.    The improper and unlawful polices and practices of the NYPD towards Black Lives Matter protesters are a continuation of the improper and unlawful policies and practices of the NYPD towards Occupy Wall Street protesters in 2011 and 2012, which subjected the City of New York to dozens of lawsuits by Occupy Wall Street protesters. Additionally, the NYPD and the City of New York were the recipients of

---

specifically acts of violent terrorism. The *Handschu Guidelines*, as amended, are incorporated by reference herein.

extensive public condemnation for their policies and practices towards Occupy Wall Street, resulting in international human rights and U.S. civil liberties experts working together and creating the *Protest and Assembly Project*, which in turn released the comprehensive report entitled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street on July 21, 2012*.[11] The Suppressing Protest Report documented numerous violations by the NYPD, such as arbitrary and selective rule enforcement, baseless arrests, unjustified closures of public space, and unfounded dispersals of peaceful assemblies.[12]

130.    Despite international condemnation for their policies and practices towards Occupy Wall Street in 2011 and 2012, the NYPD and the Defendant City of New York failed to rectify the defective and unlawful polices, customs, and practices of the NYPD, which has led to the arrests of numerous Black Lives Matter protesters engaged in lawful expressive speech activity.

131.    Further, just as the majority of Occupy Wall Street arrests in 2011 and 2012 resulted in dismissals, adjournments in contemplation of dismissal ("ACDs"), and declined prosecutions, the majority of Black Lives Matter arrests in 2014 and 2015 also resulted in dismissals, ACDs, and declined prosecutions.

132.    Since the inception of the Black Lives Matter movement, the NYPD has continually arrested, used excessive force, and retaliated against Black Lives Matter protesters for engaging in expressive speech activity.

---

[11] The Global Justice Clinic (NYU School of Law), Walter Lestner Int'l Human Rights Clinic (Fordham Law School), *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (July 21, 2012). Incorporated by reference herein, and hereafter referred to as the "Suppressing Protest Report."
[12] Suppressing Protest Report at vi.

133.    The first large Black Lives Matter Protest in New York City occurred on August 14, 2014, when demonstrators marched north from Union Square up 7th Avenue and Broadway to Times Square, where the protesters were blocked from proceeding any further by the NYPD, who had set up barricades that formed choke points of ingress and egress. The Wire reported that during the August 14, 2014 Black Lives Matter demonstration in Times Square, the NYPD "arrest[ed] people for no reason, [and] push[ed] reporters out of the way."[13]

134.    Thereafter, on November 26, 2014, in response to the failure of the Ferguson, Missouri District Attorney to secure an indictment of Darren Wilson, the white police officer who shot and killed Michael Brown, hundreds of Black Lives Matter protesters peacefully demonstrated in New York City, marching from Union Square to Times Square. Upon information and belief, approximately ten (10) peaceful protesters were arrested, which, upon information and belief, resulted in approximately ten (10) dismissals, ACDs, or declined prosecutions.

135.    On December 3, 2014, the Black Lives Matter movement engaged in expressive protest activity across New York City to demonstrate in response to the failure of the Staten Island District Attorney to secure an indictment of NYPD officer Daniel Pantaleo, the police officer who choked and killed Eric Garner on July 17, 2014.

136.    Several days before the Staten Island District Attorney announced that he had failed to indict NYPD Officer Daniel Pantaleo, New York City Police Commissioner William Bratton announced that the NYPD had been anticipating and

---

[13] Polly Mosenda, *Michael Brown Protests Spread to Times Square*, THE WIRE (Aug. 14, 2014 11:03PM ET),
 http://www.thewire.com/national/2014/08/michael-brown-protests-spread-to-times-square/376125/. Incorporated by reference herein.

preparing for the protests for months.[14] Thereafter, on December 3, 2014, New York City Police Commissioner stated that, "[w]e have had quite a bit of time to prepare for the events that will unfold here for the next few days."[15]

137.   Moreover, on December 3, 2014, New York City Mayor Bill de Blasio condoned the peaceful Black Lives Matter demonstrations that took place that day, and encouraged demonstrators to engage in further peaceful protest activity in New York City. Mayor de Blasio stated that, "[w]e are dealing with centuries of racism that has brought us to this day ... That is how profound the crisis is." Mayor de Blasio added that, "[a]nyone who believes in the values of this country should feel called to action right now."[16]

138.   The following day, December 4, 2014, the City of New York knew that a large number of peaceful protesters would gather in Union Square in Manhattan and march north to Times Square, and instructed its officers to anticipate acts of civil disobedience. Instead of learning from the numerous mass arrests of Occupy Wall Street protesters in 2011 and 2012, which led to numerous lawsuits against the City of New York and NYPD officers, and despite months of preparation, the NYPD arrested over two hundred (200) peaceful protesters at the December 4, 2014 Black Lives Matter

---

[14] Brynn Gingras, Checkey Beckford, Jonathan Dienst and Jonathan Vigliotti, *Thousands of Garner Protesters March Across NYC*, NBC New York (Dec. 4, 2014 6:12 AM), http://www.nbcnewyork.com/news/local/New-York-City-Eric-Garner-Protests-Rockefeller-Center-Times-Square-Arrests-NYPD-284722861.html. Incorporated by reference herein.

[15] Marc Santora, *Bratton at a Press Conference Earlier*, N.Y. TIMES (Dec. 3, 2014 2:31 PM), http://cityroom.blogs.nytimes.com/2014/12/03/the-death-of-eric-garner-the-grand-jury-decision/?_r=0. Incorporated by reference herein.

[16] Andy Newman, *Reaction to Eric Garner Grand Jury Decision*, N.Y. TIMES (Dec. 3, 2014 2:22 PM), http://cityroom.blogs.nytimes.com/2014/12/03/the-death-of-eric-garner-the-grand-jury-decision/?_r=0. Incorporated by reference herein.

demonstration in Times Square—including Plaintiff XAVIER ROPER—which, upon information and belief, resulted in approximately two hundred (200) dismissals, ACDs, or declined prosecutions.

139.   As the commanding officers for the NYPD's Midtown North Precinct Patrol Borough Manhattan South, Defendant INSPECTOR HART and Defendant DEPUTY INSPECTOR BEAUDETTE developed, implemented, enforced, perpetuated and/or allowed the policies of the NYPD, which caused the arrest of over two hundred (200) peaceful protesters at the December 4, 2014 Black Lives Matter demonstration in Times Square—including Plaintiff XAVIER ROPER—which, upon information and belief, resulted in approximately two hundred (200) dismissals, ACDs, or declined prosecutions.

140.   Thereafter, the NYPD has continued to inappropriately monitor and target peaceful Black Lives Matter protesters and employ extraordinary police enforcement tactics against Black Lives Matter protesters in midtown Manhattan and other areas of New York City.[17]   For example, on April 29, 2015, approximately one hundred and forty three (143) peaceful protesters were arrested amid Black Lives Matter demonstrations held in New York City to call for justice in the death of Freddie Gray, the Baltimore man who died in police custody after suffering serious spinal injuries.[18]   NYPD

---

[17] *See, e.g.*, Zauderer, Alyssa, *Police clash with 'Rise Up October' protesters in Times Square,* pix11, (Oct. 24, 2015, 10:16 PM), http://pix11.com/2015/10/24/police-clash-with-protesters-in-times-square-during-rise-up-october-demonstration/; Stepansky, Joseph, *NYPD probing video purportedly showing an anti-police brutality protester being violently shoved by cop,* THE N.Y. DAILY NEWS (Apr. 16, 2015, 12:12 AM), http://www.nydailynews.com/new-york/nyc-crime/nypd-probing-video-reportedly-showing-shoving-protestor-article-1.2187179.  Incorporated by reference herein.
[18] Beckford, Checkey, *More Than 100 Arrested in Freddie Gray Protests in NYC: NYPD,* NBC NEW YORK (Apr. 29, 2015, 6:16 PM),

officers were reported to have indiscriminately arrested and brutalized numerous protesters, reportedly hitting protesters with batons, throwing them to the ground, and subjecting at least one protester to an unlawful chokehold.[19] Upon information and belief, the approximately one hundred forty three (143) arrests of Black Lives Matter protesters on April 29, 2015 resulted in approximately one hundred forty three (143) dismissals, ACDs, or declined prosecutions.

       141.    At an October 24, 2015 Black Lives Matter protest, approximately eleven (11) protesters were arrested after the NYPD allowed them to engage in public protest activity for some time while marching from Washington Square Park to Bryant Park, where they were corralled by metal barricades erected by the NYPD, then arbitrarily surrounded and enclosed by a large number of NYPD officers, who then issued orders to disperse without providing avenues for individuals to comply with said orders.[20] Later that day, approximately six (6) additional peaceful protesters were arrested while standing on the sidewalk near the George M. Cohen statute in Times Square reading out facts regarding police brutality.[21] Upon information and belief, the approximately

---

http://www.nbcnewyork.com/news/local/Baltimore-Unity-Rally-New-York-City-Union-Square-Protests-301750981.html; Benjamin Mueller and John Surico, *Over 140 Arrested as New Yorkers Protest the Death of Freddie Gray,* N.Y. TIMES (Apr. 30, 2015), http://www.nytimes.com/2015/04/30/nyregion/hundreds-march-in-manhattan-to-protest-the-death-of-freddie-gray.html. Incorporated by reference herein.

[19] Jason Molinet, Joe Stepansky, and Laura Bult, *Protesters clash with NYPD, disrupt Holland Tunnel and West Side Highway in bid to support Baltimore activists,* N.Y. DAILY NEWS (Apr. 30, 2015 2:34 AM), http://www.nydailynews.com/new-york/nyc-protests-disrupt-holland-tunnel-west-side-highway-article-1.2204282. Incorporated by reference herein.

[20] *See* Mejia, Paula, *11 ARRESTED DURING #RISEUPOCTOBER DEMONSTRATIONS IN NEW YORK CITY,* Newsweek (Oct. 25, 2015, 4:05 PM), http://www.newsweek.com/eleven-people-arrested-during-riseupoctober-demonstrations-nyc-387133. Incorporated by reference herein.

[21] *Id.*

seventeen (17) arrests of Black Lives Matter protesters on October 24, 2015 resulted in approximately seventeen (17) dismissals, ACDs, or declined prosecutions.

142.    Moreover, at a December 15, 2015 Black Lives Matter demonstration in midtown Manhattan, in the vicinity of Rockefeller Plaza, approximately five peaceful protesters were violently arrested, which, upon information and belief, resulted in approximately five (5) dismissals, ACDs, or declined prosecutions. Upon information and belief, NYPD officers assaulted and seriously injured at least two of the five Black Lives Matter Protesters at the December 15, 2015 demonstration.[22]

143.    Despite the numerous confrontations and resulting arrests, upon information and belief, most of the arrests culminated in dismissals, ACDs, or declined prosecutions.

144.    In recent years, the NYPD has also followed an apparent custom, policy or practice of inappropriately monitoring and targeting peaceful Black Lives Matter protesters and employing extraordinary police enforcement tactics against Black Lives Matter protesters, and justifying the use of such inappropriate tactics by conflating peaceful protesters with violent terrorists.

145.    Specifically, in January 2015, NYPD Commissioner William Bratton announced that the NYPD was creating a new heavily armed unit—the Strategic Response Group—which is "designed for dealing with events like our recent [Black Lives Matter] protests, or incidents [of violent terrorist attacks] like Mumbai or what just happened in Paris." Bratton added that, "They'll be equipped with all the extra heavy

---

[22] Whiteford, Emma, *Five Black Lives Matter Protesters Arrested At Rockefeller Center: "The NYPD Went Berserk"*, GOTHAMIST (Dec. 15, 2015, 11:31 AM), http://gothamist.com/2015/12/15/black_lives_matter_arrests.php.  Incorporated by reference herein.

protective gear, with the long rifles and machine guns—unfortunately sometimes necessary in these instances."[23]

146.    Shortly thereafter, in February 2015, at a New York state Senate hearing on protests against police brutality, NYPD Commissioner William Bratton asked lawmakers to elevate the crime of resisting arrest from a misdemeanor to a felony.[24] Arrestees going limp and forcing officers to carry them off to jail was a common tactic of the civil rights movement in the 1960s—and has been used by Black Lives Matter protesters in NYC and around the country—and is considered resisting arrest by the NYPD and other law enforcement agencies.

147.    The NYPD has a long history of engaging in unlawful profiling and targeting groups of citizens. As recently stated by the Third Circuit Court of Appeals with regard to the NYPD's practice of employing undercover and counterterrorism officers to spy on Muslim citizens in and around New York City,

> What occurs here in one guise is not new. We have been down similar roads before. Jewish-Americans during the Red Scare, African-Americans during the Civil Rights Movement, and Japanese-Americans during World War II are examples that readily spring to mind. We are left to wonder why we cannot see with foresight what we see so clearly with hindsight—that "[l]oyalty is a matter of the heart and mind[,] not race, creed, or color."[25]

---

[23] *Commissioner Bratton Unveils Plans For New High-Tech Anti-Terror Police Unit,* CBS NEW YORK (Jan. 29, 2015 5:51 PM), http://newyork.cbslocal.com/2015/01/29/bratton-unveils-plans-for-new-anti-terror-police-unit/. Incorporated by reference.
[24] *NYPD's Top Cop Wants To Make It A Felony to Resist Arrest*, NPR (Feb. 10, 2015 1:39 PM), http://www.npr.org/sections/codeswitch/2015/02/10/384990293/nypds-top-cop-wants-to-make-it-a-felony-to-resist-arrest. Incorporated by reference.
[25] *Hassan v. City of New York*, No. 14-1688 (3d Cir. Oct. 13, 2015), *quoting Ex parte Mitsuye Endo*, 323 U.S. 283, 302 (1944).

148.    Defendants' actions cerate a substantial chilling effect and deterrent to First Amendment protected activity by burdening free speech activities with the risk of arrest, of being threatened with physical harm and of being, in fact, injured by the police, bound with handcuffs and having one's identification and association with a demonstration be collected and recorded by the police and transferred to federal and other law enforcement authorities for data warehousing and collection. These are civil rights violations that the Constitution does not permit.

149.    Plaintiff XAVIER ROPER's individual account is illustrative of the numerous arbitrary arrests condoned on the night of December 4, 2014, where police officers allowed the public protest activities to proceed for a time, then arbitrarily surrounded and enclosed hundreds of individuals engaged in public protest activities with large numbers of NYPD officers, issued orders to disperse without providing avenues for individuals to comply with said orders, then arbitrarily arresting individuals without witnessing actual criminal conduct or having probable cause.

150.    Similarly, Plaintiff WILLIAM LOGAN LOCKETT was paradoxically arrested for refusing an order to disperse as he attempted to leave the area of the same demonstration to find a restroom; in sum, he was allegedly arrested for refusing an order to disperse as he was attempting to disperse.

151.    There were no warrants for either Plaintiffs' arrest.

152.    Plaintiffs had been engaged in the exercise of their First Amendment rights at the times of their arrests.

153.    These violations of Plaintiffs' constitutional rights as protected by the First and Fourth Amendment occurred because the NYPD and the Defendant CITY

OF NEW YORK exhibited deliberate indifference and disregard to the effect of the policies and practices of the NYPD towards protestors and photojournalists acting without criminal conduct despite the numerous lawsuits stemming from the 2004 Republican National Committee Convention and Occupy Wall Street in 2011 and 2012; the vast majority of the Occupy Wall Street arrests resulting in dismissal; the tens of millions of dollars paid by the City in settlements and judgments in civil cases arising from mass arrests of protesters and journalists at the 2004 Republican National Committee Convention and Occupy Wall Street in 2011 and 2012; and the scathing reports in the newspapers and from human rights organizations highlighting the unconstitutional policies and practices of the NYPD.

154.    As a result of the foregoing, Plaintiffs demand judgment from Defendants in a sum of money to be determined at trial.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

155.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

156.    All of the aforementioned acts of the Defendant CITY OF NEW YORK, Defendant "John Doe" POLICE OFFICERS, Defendant OFFICER WINTER, Defendant POLICE OFFICER "LOMBARDO," Defendant POLICE OFFICER MICHAEL SHULTIS, Defendant INSPECTOR TIMOTHY BEAUDETTE, Defendant DEPUTY INSPECTOR JOHN HART, and Defendant SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs'" ("Defendants"

or "Defendant POLICE OFFICERS" unless otherwise described, henceforth), their agents, servants and employees, were carried out under the color of state law.

157. All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

158. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers with all of the actual and/or apparent authority attendant thereto.

159. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the Defendant CITY OF NEW YORK and the City of NEW YORK Police Department, all under the supervision of ranking officers of said department.

160. The individual Defendants and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

161. As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

162.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### SECOND CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983

163.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

164.    As a result of the aforesaid conduct by the Defendant POLICE OFFICERS, Plaintiffs were subjected to an illegal, improper and false arrest by the Defendant POLICE OFFICERS and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

165.    As a result of the above constitutionally impermissible conduct, Plaintiffs was caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

166.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**FAILURE TO INTERVENE UNDER 42 U.S.C. §1983**

167.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

168.    The Defendants had an affirmative duty to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights.

169.    The individual Defendants failed to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights despite having had realistic opportunities to do so.

170.    The individual Defendants failed to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights despite having substantially contributed to the circumstances within which Plaintiffs' rights were violated by their affirmative conduct.

171.    As a result of the aforementioned conduct of the individual Defendants, Plaintiffs' constitutional rights were violated.

172.    As a result of the above constitutionally impermissible conduct, Plaintiffs was caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

173.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**FALSE IMPRISONMENT AND ARREST UNDER NEW YORK STATE LAW**

174.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

175.    As a result of the aforesaid conduct by Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, Plaintiffs were unlawfully detained and confined.

176.    The Defendant POLICE OFFICERS——in performance of their duties with powers and authorities designated upon them by Defendant THE CITY OF NEW YORK——intentionally confined Plaintiffs.

177.    Plaintiffs were at all times consciously aware of their confinement by the Defendant POLICE OFFICERS.

178.    At no point throughout Plaintiffs' unlawful detention and confinement by the Defendant POLICE OFFICERS did either Plaintiff consent to said confinement.

179.    At no point throughout Plaintiffs' unlawful detention and confinement by the Defendant POLICE OFFICERS were the actions of the Defendant POLICE OFFICERS otherwise privileged.

180.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**DEPRIVATION OF PLAINTIFFS' RIGHTS AS GUARANTEED BY THE NEW**
**YORK STATE CONSTITUTION**

181.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

182.    As a result of the aforesaid conduct of Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, Plaintiffs were deprived of rights guaranteed to them by the New York State Constitution, including though not limited to the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures as described in Article I §12 of the New York State Constitution.

183.    The acts complained of were carried out by the Defendant POLICE OFFICERS in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the NEW YORK Police Department.

184.    The Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law violated Plaintiffs' constitutional rights by engaging in conduct proscribed by the New York State Constitution.

185.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION**
**UNDER 42 U.S.C. § 1983**

186.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

187.    Plaintiffs XAVIER ROPER and WILLIAM LOGAN LOCKETT were present as observers and photojournalists observing and documenting a Black Lives Matter event, and police responses thereto, at the time of the incident in question.

188.    The Defendant POLICE OFFICERS stopped and arrested Plaintiffs XAVIER ROPER and WILLIAM LOGAN LOCKETT in order to retaliate against Plaintiffs for being present as observers and/or photojournalists documenting a Black Lives Matter event, and police responses thereto.

189.    The Defendant POLICE OFFICERS stopped and arrested Plaintiffs and others in order to retaliate against Black Lives Matter demonstrators, and to chill and deter them from further First Amendment protected expression.

190.    The Defendant POLICE OFFICERS stopped and arrested Plaintiffs and others in order to retaliate against journalists covering Black Lives Matter demonstrators, and to chill and deter them from further First Amendment protected expression.

191.    Plaintiffs were not engaged in any illegal activity of any kind or sort when the Defendant POLICE OFFICERS stopped and arrested them.

192.    The Defendant POLICE OFFICERS stopped and arrested Plaintiffs in order to retaliate against them for lawfully exercising their First Amendment protected rights to free speech, expression and association.

193.    The actions of the Defendant POLICE OFFICERS heretofore described were designed to and did cause severe psychological and emotional distress in direct retaliation for Plaintiffs' exercises of their civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution, as well as the Constitution of the State of New York.

194.    As a result of the forgoing, Plaintiffs are entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

195.    As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

196.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM**
**UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. § 1983**

197.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

198.    Defendants harassed and falsely arrested Plaintiffs in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that their conduct would jeopardize Plaintiffs' liberty, well-being, safety and constitutional rights.

199.    The acts complained of were carried out by the aforementioned individual defendant Police Officers in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

200.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures and rules of the Defendant CITY and the NYPD, all under the supervision of ranking officers of said department, including but not limited to NEW YORK CITY SUPERVISING POLICE OFFICER "JOHN DOE 'Just Take Somebody and Put Them In Cuffs,'" Defendant DEPUTY INSPECTOR HART and Defendant INSPECTOR BEAUDETTE ("Supervisory Defendants").

201.    The Supervisory Defendants were, at the relevant times, supervisory personnel within the NYPD, with oversight responsibility over the other individually named Defendant POLICE OFFICERS. They were responsible for the training, instruction, supervision and discipline of the individually named Defendant POLICE OFFICERS regarding the NYPD's apparent custom, policy or practice of

targeting both professional and citizen journalists for arrest at times when said journalists are recording or otherwise documenting police interactions with civilians, in protest and other situations. The Supervisory Defendants were also responsible for instructing the other individually named Defendant POLICE OFFICERS to intentionally retaliate against professional and citizen journalists engaged in expressive speech activity in the absence of actual criminal conduct, in violation of each individual's right to protest under the First Amendment and the Fourth Amendment's prohibition against unlawful searches and seizures.

202.    The Supervisory Defendants were, at the relevant times, supervisory personnel within the NYPD, with oversight responsibility over the other individually named Defendant POLICE OFFICERS. They were responsible for the training, instruction, supervision and discipline of the individually named Defendant POLICE OFFICERS regarding the NYPD's apparent custom, policy or practice of targeting, brutalizing and falsely arresting peaceful protesters, particularly those, such as Black Lives Matter protesters, who are critical of the NYPD. The Supervisory Defendants were also responsible for instructing the other individually named Defendant POLICE OFFICERS to intentionally retaliate against peaceful protesters, particularly those, such as Black Lives Matter protesters, who are critical of the NYPD, engaged in expressive speech activity in the absence of actual criminal conduct, in violation of each individual's right to protest under the First Amendment and the Fourth Amendment's prohibition against unlawful searches and seizures.

203.   The aforementioned customs, policies, usages, practices, procedures and rules of the Defendant CITY and the NYPD include, but are not limited to, the following unconstitutional customs, policies and practices:

a)   wrongfully arresting individuals without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests);

b)   wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "contempt of cop" "cover charge" arrests);

c)   wrongfully arresting individuals without probable cause to punish individuals for requesting (a) police officer(s) name(s) and badge number(s) or otherwise attempting to document enforcement actions (i.e., "contempt of cop" arrests in violation of the June 1, 1977 consent decree entered into by Defendant City of New York in *Black v. Codd*, SDNY 73 Civ. 5283);

d)   wrongfully arresting innocent persons in order to meet quantitative "productivity goals" (i.e., arrest quotas);

e)   wrongfully arresting individuals without probable cause after allowing those individuals to engage in peaceful public protest activities for a time, then arbitrarily surrounding and enclosing those individuals engaged in public protest activities with large numbers of NYPD officers and issuing orders to disperse without providing avenues for individuals to comply with said orders—aka wrongful "trap-and-

arrest" tactics;

f)   wrongfully targeting and arresting both professional and citizen journalists without probable cause at times when said journalists are recording or otherwise documenting police interactions with civilians, in protest and other situations, to punish the journalists for documenting police interactions with civilians;

g)   wrongfully arresting individuals without probable cause to punish said individuals for engaging in peaceful demonstrations calling for an end to police brutality, including but not limited to Black Lives Matter protests and demonstrations organized by similar activist groups;

h)   wrongfully arresting individuals without probable cause to punish said individuals for engaging engaged in expressive speech activity absent actual criminal conduct in violation of each individual's right to protest under the First Amendment and the Fourth Amendment's prohibition against unlawful searches and seizures;

i)   inappropriately monitoring and targeting peaceful Black Lives Matter protesters and employing extraordinary police enforcement tactics against Black Lives Matter protesters, and justifying the use of such inappropriate tactics by conflating peaceful protesters with violent terrorists.

204.   As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional

distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to their reputations and standings within their communities.

205.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed. Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**WHEREFORE and in light of the foregoing**, it is respectfully requested that the Court

assume jurisdiction and:

      [a] Invoke pendent party and pendent claim jurisdiction.

      [b] Award appropriate compensatory and punitive damages.

      [c] Award appropriate declaratory and injunctive relief.

      [d] Empanel a jury.

      [e] Award attorney's fees and costs.

      [f] Award such other and further relief as the Court deems to be in the

interest of justice.

Dated: New York, New York             Respectfully Submitted,
       February 25, 2016


                           ELLIOT DOLBY-SHIELDS, ESQ.
                           SAMUEL B. COHEN, ESQ.
                           Attorneys for Plaintiffs


            By:       ~//s//~
                Elliot Dolby-Shields, Esq. [ED3372]
                235 West 137th Street, No. 2F
                New York, New York 10030
                Ph: (585) 749-2089
                edshieldslaw@gmail.com


                    ~//s//~
                Samuel B. Cohen, Esq. [SC0622]
                494 8th Avenue Suite 1000
                New York, New York 10001
                P/F: (212) 537-5919
                Sam@SamCohenLaw.com